# UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF LOUISIANA

| | | |
|---|---|---|
| **WILLIAM J. FITZGERALD, III,** and | * | **CIVIL ACTION NO.:** |
| **DIANNA M. FITZGERALD** | * | |
| | * | |
| **VERSUS** | * | |
| | * | |
| **BP EXPLORATION & PRODUCTION, INC.,** | * | |
| **ET AL.** | * | |

**\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\***

## COMPLAINT

NOW INTO COURT, through undersigned counsel, come Plaintiffs, William J. Fitzgerald, III and Dianna M. Fitzgerald, both persons of the full age of majority and residents of the Parish of Plaquemines, State of Louisiana, individually and on behalf of decedent Nathan Joseph Fitzgerald, who respectfully represent that:

1.      On April 20, 2010, an explosion and fire occurred on the *Deepwater Horizon* oil vessel, thereafter resulting in the release of thousands of barrels of crude oil into the Gulf of Mexico (the "Oil Spill").

2.      On October 26, 2012, William J. Fitzgerald, III and Dianna M. Fitzgerald, individually and on behalf of their deceased son Nathan Joseph Fitzgerald, opted-out of and excluded the claims herein from the Medical Class of the Deepwater Horizon Benefits Settlement.

## PARTIES

**A.      Plaintiffs**

3.      Nathan Joseph Fitzgerald (hereinafter referred to as "Decedent") worked to clean up oil and chemicals during the clean-up following the Oil Spill.

4.      Decedent was exposed to oil, dispersants, hazardous and harmful chemicals, odors and emissions during the clean-up following the Oil Spill.

5.      Prior to Oil Spill, Decedent was in good health.

6.      After the clean-up following the Oil Spill, Decedent was diagnosed with Acute Lymphoblastic Leukemia ("ALL") and Acute Myeloid Leukemia ("AML") (hereinafter referred to as "Decedent's Cancer").

7.      Decedent's Cancer was proximately caused by Decedent's exposure to the oil, dispersants, hazardous and harmful chemicals, odors and emissions during the clean-up following the Oil Spill.

8.      As a result of Decedent's Cancer, Decedent and Plaintiffs suffered damages, including, but not limited to, pain and suffering, loss of consortium, loss of enjoyment of life, loss of love and affection, pre-death fear, mental anguish, grief, profound depression, anxiety and suffering; medical and related expenses, past and future, funeral costs, loss of earning and/or earning capacity.

9.      As a result of Decedent's Cancer, Decedent died on April 9, 2012.

10.      Pursuant to Louisiana Civil Code articles 2315.1 and 2315.2, Plaintiffs William J. Fitzgerald, III and Dianna M. Fitzgerald, as the surviving parents of Nathan Joseph Fitzgerald, are entitled to recover and seek herein all damages, including, but not limited to, survival and wrongful death damages, for the death of Decedent.

**B.      Defendants**

***The BP Defendants***

11.      Defendant **BP Exploration & Production, Inc.** ("BP Exploration") is a Delaware corporation with its principal place of business in Warrenville, Illinois, at all pertinent times licensed to do business and doing business in the State of Louisiana and within this district. BP Exploration was a holder of a lease granted by the Minerals Management Service ("MMS"), now

known as the Bureau of Ocean Energy Management, Regulation, and Enforcement ("BOEMRE"),  allowing it to perform oil exploration, drilling, and production-related operations in Mississippi Canyon Block 252, the location known as "Macondo" where the Oil Spill originated.

12.     Defendant **BP America Production Company** ("BP America") is a Delaware corporation with its principal place of business in Houston, Texas, at all pertinent times licensed to do business and doing business in the State of Louisiana and within this district.  BP America Production was the party to the Drilling Contract with Transocean Ltd. for the drilling of the Macondo well by the *Deepwater Horizon* vessel.

13.     Defendant **BP p.l.c.** is a British public limited company with its corporate headquarters in London, England, not licensed to do business in the State of Louisiana, but at all pertinent times was doing business in the State of Louisiana and within this district.  Defendants BP Exploration and BP America are wholly-owned subsidiaries of BP p.l.c. and are sufficiently controlled by BP p.l.c. so as to be BP p.l.c.'s agents in Louisiana.

14.     This Court has jurisdiction over BP p.l.c. pursuant to Louisiana's long-arm statute (13 Louisiana Statute § 3201(B)), Rule 4(k)(1)(A) of the Federal Rules of Civil Procedure, and/or Rule 4(k)(2) of the Federal Rules of Civil Procedure.

15.     In addition, this Court also has personal jurisdiction over BP p.l.c. under agency and alter ego principles, because BP p.l.c.'s agents, BP America and BP Exploration, do business in Louisiana. BP America and BP Exploration are both wholly-owned subsidiaries of BP p.l.c.

16.     Moreover, BP p.l.c. undertook the duty to clean up the Oil Spill and as a result is liable for its acts and omissions in the attempt to clean-up the Oil Spill.

17.     BP Exploration, BP America and BP p.l.c. are generally referred to collectively as "BP." As lease operator of the Macondo prospect site, BP was responsible for assessing the geology of the prospect site, engineering the well design, obtaining regulatory approvals for well operations, and retaining and overseeing the contractors working on the various aspects of the well and the drilling operations.

### The Transocean Defendants

18.     Defendant **Transocean Ltd.** ("Transocean Ltd.") is a Swiss corporation that maintains U. S. offices in Houston, Texas, not licensed to do business in the State of Louisiana, but at all pertinent times was doing business in the State of Louisiana and within this district. Transocean Ltd. was an owner, managing owner, owner *pro hac vice*, and/or operator of the *Deepwater Horizon*.

19.     Defendant **Transocean Offshore Deepwater Drilling, Inc.** ("Transocean Offshore") is a Delaware corporation with its principal place of business in Houston, Texas, not licensed to do business in the State of Louisiana, but at all pertinent times was doing business in the State of Louisiana and within this district. Transocean Offshore is affiliated with Transocean Ltd. and was an owner, managing owner, owner *pro hac vice*, and/or operator of the *Deepwater Horizon*.

20.     Defendant **Transocean Deepwater, Inc.** ("Transocean Deepwater") is a Delaware corporation with its principal place of business in Houston, Texas, not licensed to do business in the State of Louisiana, but at all pertinent times was doing business in the State of Louisiana and within this district. Transocean Deepwater is affiliated with Transocean Ltd. and was an owner, managing owner, owner *pro hac vice*, and/or operator of the *Deepwater Horizon*.

21.     Defendant **Transocean Holdings, LLC** ("Transocean Holdings") is a Delaware corporation with its principal place of business in Houston, Texas. Transocean Holdings is

affiliated with Transocean Ltd. and is a wholly-owned subsidiary of Transocean Offshore. Transocean Holdings is an owner, managing owner, owner *pro hac vice*, and/or operator of the *Deepwater Horizon* and participated in the *Deepwater Horizon*'s offshore oil drilling operations at the Macondo prospect, where the Oil Spill originated. More specifically, Transocean Holdings is party to the contract with BP regarding the lease of the *Deepwater Horizon* for drilling operations in the Gulf of Mexico.

22.     Defendant **Triton Asset Leasing GmbH** ("Triton") is a Swiss limited liability company with its principal place of business in Zug, Switzerland, not licensed to do business in the State of Louisiana, but at all pertinent times was doing business in the State of Louisiana and within this district. Triton is affiliated with Transocean Ltd. and is an owner, managing owner, owner *pro hac vice*, and/or operator of the *Deepwater Horizon*.

23.     Defendants Transocean Ltd., Transocean Deepwater, Transocean Offshore, Transocean Holdings, and Triton are hereinafter referred to collectively as "Transocean." At the Macondo site, Transocean provided the Deepwater Horizon vessel and personnel to operate it. At all times relevant to the Oil Spill, Transocean, subject to BP's inspection and approval, was responsible for maintaining well control equipment, such as the blowout preventer and its control systems. Transocean also provided operational support for drilling-related activities on board the *Deepwater Horizon*, as well as onshore supervision and support for those drilling activities at all times relevant to the Oil Spill.

24.     Defendant **Halliburton Energy Services, Inc.** ("Halliburton"), is a Delaware corporation, at all pertinent times licensed to do business and doing business in the State of Louisiana and within this district. Halliburton was the service provider for the Macando well and was engaged in cementing operations of the well and well cap.

*The Dispersant Defendants*

25.     Defendant **Marine Spill Response Corporation** ("MSRC") is a Tennessee non-profit corporation with its principal place of business in Herndon, Virginia, at all pertinent times licensed to do business and doing business in the State of Louisiana and within this district. MSRC participated in the post-explosion Oil Spill remediation and response efforts.

26.     Defendant **Airborne Support, Inc.** ("ASI") is a Florida corporation with its principal place of business in Houma, Louisiana, at all pertinent times licensed to do business and doing business in the State of Louisiana and within this district. ASI participated in the post-explosion Oil Spill remediation and response efforts.

27.     Defendant **Airborne Support International, Inc.** ("ASI International") is a Louisiana corporation with its principal place of business in Houma, Louisiana, at all pertinent times licensed to do business and doing business in the State of Louisiana and within this district. ASI International participated in the post-explosion Oil Spill remediation and response efforts.

28.     Defendant **Lynden, Inc.** is a Washington Corporation with its principal place of business in Seattle, Washington, not licensed to do business in the State of Louisiana, but at all pertinent times was doing business in the State of Louisiana and within this district.  Further, Lynden, Inc. at all pertinent times was doing business in the State of Louisiana by virtue of its 100 percent ownership interest in Defendant **Lynden Air Cargo, LLC**, an Alaska limited liability company with is principal place of business in Seattle, Washington, which at all pertinent times was doing business in the State of Louisiana (collectively, "Lynden"). Lynden participated in the post-explosion Oil Spill remediation and response efforts.

29.     Defendant **Dynamic Aviation Group, Inc.**, ("Dynamic") is a Virginia corporation with its principal place of business in Bridgewater, Virginia, at all pertinent times licensed to do

business and doing business in the State of Louisiana and within this district. Dynamic participated in the post-explosion Oil Spill remediation and response efforts.

30.     Defendant **International Air Response, Inc.** ("IAR") is an Arizona corporation with its principal place of business in Coolidge, Arizona, not licensed to do business in the State of Louisiana, but at all pertinent times was doing business in the State of Louisiana and within this district. IAR participated in the post-explosion Oil Spill remediation and response efforts.

31.     Defendant **Lane Aviation** ("Lane") is a Texas corporation with its principal place of business in Rosenberg, Texas, not licensed to do business in the State of Louisiana, but at all pertinent times was doing business in the State of Louisiana and within this district. Lane participated in the post-explosion Oil Spill remediation and response efforts.

32.     Defendant **National Response Corporation** ("NRC") is a Delaware corporation with its principal place of business in Great River, New York, at all pertinent times licensed to do business and doing business in the State of Louisiana and within this district (together with Defendant **SEACOR Holding, Inc.**, a Delaware corporation with its principal place of business in Delaware, of which NRC is a wholly-owned subsidiary). NRC participated in the post-explosion Oil Spill remediation and response efforts.

33.     Defendant **O'Brien Response Management, L.L.C.** ("O'Brien") is a Louisiana limited liability company, formerly known as O'Brien Response Management, Inc. with its principal place of business, in the Parish of St. Tammany, State of Louisiana, and at all pertinent times licensed to do business and doing business in the State of Louisiana and within this district. O'Brien participated in the post-explosion Oil Spill remediation and response efforts.

34.     Defendant **Tiger Safety, LLC** ("Tiger") is a Louisiana limited liability company with its principal place of business, upon information and belief, in the Parish of East Baton Rouge, State

of Louisiana. Tiger participated in the post-explosion Oil Spill remediation and response efforts.

35.     Defendant **DRC Emergency Services, LLC** ("DRC") is an Alabama limited liability company at all pertinent times licensed to do business and doing business in the State of Louisiana and within this district. DRC participated in the post-explosion Oil Spill remediation and response efforts. DRC Emergency Services, LLC was an employer of Decedent during the post-explosion Oil Spill remediation and response efforts.

36.     Defendants MSRC, NRC, IAR, ASI, ASI International, Lane, Lynden, Dynamic, O'Brien, Tiger and DRC are collectively referred to as the "Dispersant Defendants."

### Nalco Defendant

37.     Defendant **Nalco Company** is a Delaware corporation, at all pertinent times licensed to do business and doing business in the State of Louisiana and within this district, wholly owned by Defendant **Nalco Holdings LLC**, a Delaware limited liability company. Nalco Holdings LLC is wholly owned by Defendant **Nalco Finance Holdings LLC**, a Delaware limited liability company. Nalco Finance Holdings LLC is wholly owned by Nalco Holding Company, a Delaware corporation. Nalco Company, Nalco Holdings LLC, Nalco Finance Holdings LLC and Nalco Holding Company are collectively referred to as "Nalco." At all pertinent times, Nalco was doing business in the State of Louisiana.

38.     Nalco is the manufacturer of the chemical dispersants purchased by BP for use in connection with clean-up efforts in response to the Oil Spill.

### Other **Defendants**

39.     Defendant, **DRC Marine, LLC** is an Alabama limited liability company at all pertinent times licensed to do business and doing business in the State of Louisiana and within this district. DRC Marine, LLC was an employer of Decedent during the post-explosion Oil Spill remediation

and response efforts.

40.     Defendant, **SAMCO Restoration Group, LLC**, formerly known as SAMCO

Corp., LLC, is a Louisiana limited liability company at all pertinent times licensed to do business

and doing business in the State of Louisiana and within this district. SAMCO Group Corp., LLC

was an employer of Decedent during the post-explosion Oil Spill remediation and response

efforts.

41.     Defendant **Down South Services, LLC** is a Louisiana limited liability at all pertinent

times licensed to do business and doing business in the State of Louisiana and within this district.

Down South Services, L.L.C. provided an Occupational Safety and Health Administration

Hazardous Waste Operations and Emergency Response awareness training class ("HAZWOPER

Class") to Decedent.

42.     Defendant **Betty R. Fisher** is an individual domiciled in Louisiana.  Betty R. Fisher was

an employee of Down South Services, L.L.C., who instructed the HAZWOPER Class in which

Decedent was a student.

43.     Each of these Defendants is liable jointly, severally, and in solido under various

principles of federal, maritime and/or applicable state tort law for the damages claimed by

Plaintiffs herein, including, but not limited to, survival and wrongful death damages, as a result

of the death of Decedent after participation in the post-explosion Oil Spill remediation and

response efforts, together with legal interest from date of judicial demand, plus all costs of these

proceedings, for the following reasons to-wit:

## JURISDICTION AND VENUE

44.     Jurisdiction exists before this Court pursuant to Article III, Section 2 of the United States

Constitution, which empowers the federal judiciary to hear "all Cases of admiralty and maritime

Jurisdiction."

45.     This Court also has jurisdiction over this action pursuant to 28 U.S.C. §§ 1331 and 1333, which extend exclusive Federal jurisdiction to the Outer Continental Shelf.

46.     This Court also has jurisdiction over this action pursuant to The Admiralty Extension Act, 46 U.S.C. § 30101, which extends the admiralty and maritime jurisdiction of the United States to cases of injury or damage, to person or property, caused by a vessel on navigable waters, even though the injury or damage is done or consummated on land.

47.     This Court has supplemental jurisdiction over Plaintiffs' state law claims pursuant to 28 U.S.C. § 1367.

48.     The claims presented herein are admiralty or maritime claims within the meaning of Rule 9(h) of the Federal Rules of Civil Procedure.

49.     Venue is appropriate in this District under 28 U.S.C. § 1391, because the events or omissions giving rise to the claims asserted herein occurred in this District. Venue is also appropriate in this District consistent with 28 U.S.C. § 1407. Venue is also appropriate in this District pursuant to the Oil Pollution Act ("OPA"), 33 U.S.C. § 2717 (b), because the discharge, injuries and damages occurred in this District.

Accordingly, Plaintiffs, by their undersigned counsel, submit this Complaint for actual, compensatory and punitive damages and other relief arising from the Oil Spill and the clean-up following the Oil Spill, and state as follows:

## FACTUAL ALLEGATIONS

**A.     The *Deepwater Horizon* Catastrophe**

50.     The *Deepwater Horizon* was an ultra-deepwater dynamic positioned semi-submersible oil vessel built in 2001. It was leased to BP through September 2013.

51.     BP leased the *Deepwater Horizon* to drill exploratory wells at the Macondo prospect site in Mississippi Canyon Block 252, a location on the Outer Continental Shelf off the coast of Louisiana.

52.     On April 20, 2010, workers on the *Deepwater Horizon* oil vessel lost control of the Macondo well resulting in an explosion and fire.

53.     On April 22, 2010, the *Deepwater Horizon* sank.

54.     As the *Deepwater Horizon* sank, the riser pipe connecting the vessel to the wellhead on the seafloor bent and broke, leaving the pipe leaking oil. An emergency valve, installed on the wellhead for just such a disaster, failed to seal the wellhead as it should have, causing the blown-out well to spew thousands of barrels of crude oil into the Gulf waters (the "Oil Spill") for 86 days.

55.     After the Oil Spill, an oil slick with a range of thousands of miles had formed. Additionally, thick, voluminous plumes of oil were identified in deep waters within the Gulf of Mexico. The Oil Spill caused this slick and these plumes to form. Oil washed ashore in the Gulf of Mexico, posing significant environmental and public health risks.

56.     As the oil made landfall along the Gulf Coast, it infiltrated the delicate wetlands and intertidal zones that line the coast of Louisiana requiring clean up.

57.     The OPA imposes liability upon a "responsible party for a . . . facility from which oil is discharged . . . into or upon navigable waters or adjoining shorelines" for the damages that result from such incident as well as removal costs. 33 U.S.C. § 2702.

58.     The U.S. Coast Guard is responsible for implementing many aspects of the OPA, including designating responsible parties, as well as responding to oil spills and supervising and/or coordinating response actions.

59.     After the Oil Spill, BP Exploration and Transocean Holdings were designated as "Responsible Parties" by the U.S. Coast Guard under the Oil Pollution Act of 1990, 33 U.S.C. § 2714.

*The Crude Oil*

60.     The crude oil contains benzene and other volatile organic compounds ("VOCs") – chemical compounds that can affect the environment and human health -- such as ethylbenzene, toluene, xylene and naphthalene, polycyclic aromatic hydrocarbons ("PAHs"), diesel fumes and heavy metals such as aluminum, cadmium, nickel, lead and zinc.

61.     Chemicals such as benzene and PAHs are toxic components of crude oil and of grave concern. These and many other chemicals in crude oil are volatile, moving from the oil into the air. Once airborne, they can blow over the ocean for miles, reaching communities far from the spill. They may be noticed as petroleum odors. Consequently,  both those working on the spill and people who are a distance from it can be exposed to crude oil chemicals in the air.

62.     According to the Agency for Toxic Substances and Disease Registry ("ASTDR"), which is part of the U.S. Department of Health and Human Services, benzene is a known mutagen and carcinogen. Benzene in the crude oil can cause a variety of specific effects described in the recent Centers for Disease Control ("CDC") summary of benzene toxicity: ventricular fibrillation, congestive gastritis, toxic gastritis, pyloric stenosis, myalgia, kidney damage, skin irritation and burns, swelling and edema, vascular congestion in the brain and lethal central nervous system depression.

63.     A 2007 CDC review of benzene toxicity concluded that there is substantial human evidence that **benzene causes leukemia**. It also reports aplastic anemia (a precursor of leukemia), chromosomal abnormalities in lymphocytes and bone marrow cells, damage to the

immune system and abnormal development of blood cells. When blood cells are deficient, this can cause other serious medical conditions, including infection due to a lack of leukocytes and increased cardiac stress due to a lack of erythrocytes. Long term low level oral and inhalation exposures have also caused peripheral nervous system abnormalities, distal neuropathy, difficulty sleeping and memory loss.

**B.      The Response Effort and the Vessels of Opportunity**

64.      After the disaster, BP began implementing a disaster response plan to prevent oil from escaping the blown out well, to manually contain the oil, and to disperse oil in the water using Nalco's chemical dispersants.

65.      BP's response to the Oil Spill included the use of chemical dispersants manufactured by Nalco that were intended to break down the oil into finely dispersed droplets. Dispersants generally contain a solvent, a surfactant and other additives that break up the surface tension of an oil slick or sheen to make the oil more soluble in water.

66.      As part of its offshore containment response program, BP directed the use of vessels to recover oil coming to the surface of the Gulf of Mexico; the use of vessels to skim oil from the surface of the water; the use of vessels to conduct *in situ* burning of oil that reached the surface of the water; and the use of Vessels of Opportunity ("VoO").

67.      The VoO program used commercial and charter fishing vessels and other boats from communities along the shoreline to tow and deploy booms – floating barriers intended to contain, deflect, or hold back oil floating on the water's surface. Other VoOs worked with absorbent booms used to soak up some of the millions of gallons of oil coming to the surface of the Gulf. Still other VoOs supported *in situ* burning efforts. Some VoOs conducted skimming operations to skim oil off the surface. Other VoOs recover light oil and tar balls.

68.     To qualify as a crew member on a VoO, a person must complete a four-hour worker safety training program.

69.     If BP deemed that a vessel would come in contact with oil, it need only be staffed with one person who has completed a forty-hour HAZWOPER Class.

70.     Decedent attended a HAZWOPER Class  instructed by Defendants Down South Services, L.L.C. and Betty R. Fisher.

71.     Defendants Down South Services, L.L.C. and Betty R. Fisher failed to properly train Decedent as required by law during the HAZWOPER Class.

72.     BP required vessels working near the source of the Oil Spill to provide crewmembers with respirators and appropriate training and fitting, but VoO crewmembers were not provided with respirators and appropriate training and fitting.

**C.      The Use of Chemical Dispersants**

*Corexit® 9500 and 9527*

73.     The Material Safety Data Sheets ("Data Sheets") – forms that set for the properties of a particular substance, including its toxicity and health effects -- for Corexit® 9500 and  Corexit® EC9527A, the dispersants used by BP and the Dispersant Defendants, indicate the **dispersants are known carcinogens** and harmful to the human body.

74.     BP and Dispersant Defendants used the dispersants Corexit® 9500 and 9527 (more than 1.8 million gallons) to disperse the crude oil on the surface of the Gulf of Mexico and to disperse the crude oil near the wellhead 5,000 feet below the surface of the Gulf of Mexico.

75.     Although not listed as a separate ingredient of the dispersants, when the dispersants are manufactured, a byproduct is formed at that time: 1,4 dioxane. The U.S. Department of Health and Human Services reasonably anticipates that exposure to 1,4 dioxane causes cancer.

76.     In addition to directing vessels at sea, BP coordinated and directed aircraft owned and/or operated by Defendants MSRC, O'Brien, Tiger, NRC, Lane, Dynamic, ASI, ASI International, Lynden, and IAR to fly out over the Gulf to spot oil slicks and to spray chemical dispersants to oil on the surface of the Gulf.

77.     Upon information and belief, immediately after the *Deepwater Horizon* disaster, on or about April 23, 2010, BP began subsea and aerial application of chemical dispersants manufactured by Defendant Nalco to the resulting oil slicks and sheens on the surface of the Gulf.

78.     Data Sheet for Nalco's Corexit® 9500 indicates that it contains the following hazardous substances: petroleum distillates, propylene glycol and organic sulfonic acid salt. The Data Sheet for Nalco's Corexit® 9500 states that it is harmful to human health and that dermal exposure, inhalation, and ingestion should be avoided.

79.     The Data Sheet for Nalco's Corexit® EC9527A indicates that it contains the following hazardous substances: 2-butoxyethanol (EGBE), organic sulfonic acid salt and propylene glycol. The Data Sheet for Nalco's Corexit® EC9527A states that it is harmful to human health and that dermal exposure, inhalation, and ingestion should be avoided.

80.     Both Nalco's Corexit® products used by BP contain non-specified organic sulfonic acid salt, which is "moderately toxic."

81.     On or about May 19, 2010, the U.S. Environmental Protection Agency ("EPA") Administrator directed BP within 24 hours of issuance to identify and to change to chemical dispersants that are less toxic than Nalco's Corexit® dispersants BP had been using.

82.     On May 20, 2010, BP objected to changing dispersants and notified the EPA that it would continue using Nalco's Corexit®.

83. Thereafter, on May 22, 2010, BP used 45,000 gallons of chemical dispersants and on May 23, 2010, BP used 70,000 gallons of chemical dispersants.

84. On May 26, 2010, the EPA directed BP to reduce overall use of Nalco's Corexit® by 75%. The May 26, 2010 EPA directive also required BP to eliminate use of chemical dispersants on the surface except in rare cases where an exemption is sought in writing from and approved by the On Site Coordinator.

85. After the May 26, 2010 EPA directive, BP sought more than 40 exemption requests to use chemical dispersants on the surface of the Gulf of Mexico.

86. According to the Aerial Dispersants Operations – Houma Status Report, as of June 26, 2010, BP applied 933,023 gallons by aerial application. BP ordered the application by 386 flights, or sorties, as of that same date. BP and Dispersant Defendants covered approximately 291 square miles of the Gulf with dispersant. As of June 26, 2010, 718,454 gallons of Nalco's Corexit® 9500 have been sprayed on the Gulf and 214,569 gallons of Nalco's Corexit® 9527. Upon information and belief, BP stopped using Nalco's Corexit® 9527 on May 23, 2010, when supplies allegedly ran out.

87. According to the Aerial Dispersants Operations – Houma Status Report, as of June 26, 2010, BP used at least 10 spray aircraft and eight spotter aircraft.

88. MSRC owns at least six of the eight spotter aircraft used in connection with BP's aerial spraying of chemical dispersants. MSRC and/or its contractor Dynamic operate the spotter aircraft.

89. MSRC owns four of the ten spray planes used in connection with BP's aerial spraying of chemical dispersants. MSRC and/or its contractors, Lynden Air Cargo and/or Dynamic Aviation, operate the spray planes.

90.     ASI and/or ASI International own and operate at least two spotter aircraft and three spray planes used in connection with BP's aerial spraying of chemical dispersants.

91.     IAR owns and operates at least one spray plane used in connection with BP's aerial spraying of chemical dispersants.

92.     Dynamic owns and operates at least one spray plane used in connection with BP's aerial spraying of chemical dispersants.

93.     Lane owns one spray plane used in connection with BP's aerial spraying of chemical dispersants, which is operated by NRC.

94.     Defendant Nalco knew or should have known that its chemical dispersants would be applied beneath the surface of the water, on the surface of the water, and aerially from planes.

**D.     Decedent's Exposure to Harmful Chemicals**

95.     Decedent was hired by DRC Marine, L.L.C., DRC Emergency Services, L.L.C., and SAMCO Group Corp. (now known as SAMCO Restoration Group, L.L.C.) to clean up beaches, marshes, wetlands and other onshore areas by removing polluted sand, collecting tarballs, laying or collecting boom, hand-applying dispersant in inland areas, and other related clean up efforts following the Oil Spill.

96.     Prior to beginning clean-up efforts, Defendants DRC Marine, L.L.C. and DRC Emergency Services, L.L.C. had Decedent attend the HAZWOPER course instructed by Defendants Down South Services, L.L.C. and Betty R. Fisher.

97.     Decedent assisted in the effort to prevent oil slicks from reaching the shore, and cleaning oil spill residue from the beaches, marshes and estuaries by participating in the relief effort orchestrated by BP. As part of this effort, Decedent came into contact with crude oil, chemical dispersants and oil/chemical mixtures. BP's aerial spray planes have negligently and/or

intentionally sprayed chemical dispersants on the water despite the presence of boats and their crews in the vicinity of the spraying.

98.     Decedent was working on boats, which may have been part of the "Vessel of Opportunity" Program that were dispatched to lay boom to absorb the oil, or to haul in oil saturated booms, among other activities. In this capacity, Decedent was exposed to crude oil, crude oil mixed with chemical dispersants and/or other harmful chemicals by inhalation, ingestion, dermal (skin) absorption, and through contact with the eyes while he was working.

99.     Decedent was not outfitted with a respirator or equivalent safety device.

100.    Upon information and belief, when VoOs spot oil slicks, they are instructed to contact BP directly and to provide BP with the coordinates of the slick. Upon receiving this information, Dispersant Defendants dispatched a spray plane from an airfield to the coordinates given and instruct the pilot to spray the chemical dispersant from its cargo hold.

101.    Decedent was not given warning by Defendants of the plane's approach and are either directly or indirectly in the path of the spray zone, and/or the chemical dispersant spray drifts over Decedent while he was working.

102.    Decedent did not receive warning of aerial dispersant missions and have come into contact by inhalation and dermal exposure with dispersants and oil/dispersant mixtures, oil and/or other harmful chemicals.

**E.      Willful and Wanton Conduct of the Defendants**

103.    Defendants focused primarily on profit while disregarding public and environmental health and safety while undertaking their ultra-hazardous activities on the *Deepwater Horizon* and during the subsequent attempt to clean the Oil Spill. As demonstrated by the examples below, and by the foregoing factual allegations, Defendants' conduct evinced an ongoing willful,

wanton, or reckless disregard for and indifference toward the safety of the people in the Gulf States, including Decedent.

104.    Defendants BP, Transocean, and Halliburton recklessly, willfully and/or wantonly failed to ensure that oil would expeditiously and adequately be contained within the immediate vicinity of the *Deepwater Horizon* in the event of a blowout.

105.    Defendants BP, Transocean, and Halliburton recklessly, willfully and/or wantonly failed to ensure that that adequate safeguards, protocols, procedures and resources would be readily available to prevent and/or mitigate the effects an uncontrolled oil spill into the waters of the Gulf of Mexico and to prevent injuring Decedent.

106.    Defendants recklessly, willfully and/or wantonly failed to use reasonably safe dispersant chemicals or other chemicals in their attempts to respond to the Oil Spill, and thereby exacerbated the pollution of the Gulf of Mexico and injury to Decedent.

107.    Defendants, by their conscious and/or deliberate unreasonable acts and/or omissions complained of herein, and/or as the evidence may show, displayed gross negligence, reckless indifference, willfulness and/or wantonness.

**F.      Defendants' Knowledge Of The Risks**

108.    Defendants aware of the risks that Decedent would face during the clean-up following the Oil Spill, ignored worker safety concerns, even in the face of OSHA warnings and notification by the Department of Health and Human Services that vessels and clean up workers were complaining of illnesses after being exposed to oil and dispersants.

109.    At all times relevant to this litigation, Defendants knew or should have known that:

      a.      crude oil contains chemicals hazardous to human health;

      b.      chemical dispersants contain chemicals hazardous to human health;

c.   Decedent should have been adequately and timely warned of the harmful effects of crude oil and chemical dispersants, and the hazardous substances which they contain; and

d.   Decedent should have worn proper protective clothing and respirators.

## DAMAGES

110.   Decedent suffered physical injury and ultimately death from exposure to oil, Nalco's dispersants, and/or oil and dispersant mixtures.

111.   As a result of Defendants' acts or omissions, Plaintiffs are entitled to recover the following damages:

a.   Death of the Decedent;

b.   Pain and Suffering;

c.   Loss of consortium;

d.   Loss of enjoyment of life;

e.   Loss of love and affection;

f.   Pre-death fear;

g.   Mental anguish, grief, profound depression, anxiety and suffering;

h.   Medical and related expenses, past and future;

i.   Funeral Costs;

j.   Loss of earning and/or earning capacity;

k.   Punitive or exemplary damages;

l.   Other items of damage which may be shown through discovery or at trial;

m.   All appropriate general and equitable relief;

n.   Prejudgment interest on all sums awarded from date of loss until paid;

o.      Post-judgment on all sums awarded from date of judgment until paid; and

p.      All court costs and litigation costs allowed by law.

## CAUSES OF ACTION

**Negligence (Against All Defendants)**

112.    Plaintiffs maintain that Defendants were negligent in causing the fire and explosion and the uncontrolled release of massive oil, chemicals and gasses and during the clean-up following the Oil Spill, resulting in injuries and damages to Decedent and Plaintiffs, for the following reasons or as may appear at the trial of this matter:

a.      Failing to take appropriate safety measures and procedures during drilling, cementing and/or casing of the well to ensure there was no blowout;

b.      Continuing to go forward with operations aboard the vessel to close the well and cement the well, when Defendants knew or should have known that the cement job was likely a failure and would lead to a massive blowout of the well with release of oil, gasses and chemicals;

c.      Failing to have appropriate safety measures in place to prevent the blowout of the well, and proceeding to cement and/or leave the well site, knowing that said activities would likely lead to failure as previously indicated and which was known to Defendants at least a week prior to the explosion;

d.      Failing to provide equipment that was adequate to prevent a blowout of this well;

e.      Failing to properly ensure that the well was cemented and/or to test that the cementing was properly completed before beginning to remove drilling mud and replace it with saltwater;

f.      Increasing the risk of personal injury and damages by adding toxic agents,

dispersing the oil, or otherwise employing negligent or harmful methods and/or agents, and/or unreasonably failing to employ necessary and/or appropriate methods and/or agents in the Oil Spill clean-up, control and/or remediation process; and/or,

g.     Failing to provide Decedent with adequate personal protection from the fumes, gasses, noxious chemicals and particles to which he became exposed while working on the cleanup;

h.     Failing to have adequate ventilation, respiratory equipment, compressed air or other means of providing good air supply to members of the crews in the Vessels of Opportunity Program, including Decedent;

i.     Ordering, instructing, employing and/or directing the Vessels of Opportunity into areas of extreme danger for exposure to crude oil, crude oil fumes, burning crude oil fumes and noxious chemicals and particles, as well as various other chemicals, either injected into the well or sprayed onto the surface of the water and oil;

j.     Failing to thoroughly advise crew members such as Decedent of the nature and dangers of the hazardous chemicals and noxious fumes to which he would be exposed as a member of the burn unit/burn team;

k.     Failing to provide adequate pre-job physical and safety training to guard against potential exposures and hazards involved in the burn unit/burn team;

l.     Discouraging the use of respirators or other respiratory protective equipment without considering the respiratory problems and issues faced by crew members, such as Decedent;

m.      Subjecting crew members, such as Decedent, to exposure to numerous combinations of chemicals, as well as burning these chemicals and creating a toxic mixture of fumes which Defendants never properly warned and/or protected the crew members from such exposure.

**Negligence (Against All Defendants Except Nalco)**

113.    BP took control and directed all aspects of the recovery and relief effort to attempt to contain the Oil Spill, prevent oil from damaging the Gulf of Mexico and the shoreline, and to clean up the damage caused to date. Defendants owed a duty to Decedent and Plaintiffs to exercise due care in the operation, maintenance, handling, design, implementation and execution of the relief and recovery measures. Defendants failed to exercise reasonable care in the operation, maintenance, handling, design, implementation and execution of the relief and recovery measures.

114.    At all times relevant to this litigation, Defendants knew or should have known that:

a.      crude oil contains chemicals hazardous to human health;

b.      chemical dispersants contain chemicals hazardous to human health;

c.      Decedent should be adequately and timely warned of the harmful effects of crude oil and chemical dispersants, and the hazardous substances which they contain; and

d.      Defendants' failure to otherwise exercise reasonable care in the operation, maintenance, handling, design, implementation and execution of the relief and recovery measures would result in harm to Decedent.

115.    Defendants' conduct fell below the duty of care owed to Decedent amounting to a breach of that duty. Defendants owed Decedent the following duties:

    a.    a duty to warn Decedent of the harmful effects of crude oil, chemical dispersants and any mixture thereof, and the hazardous chemicals they contain;

    b.    a duty to properly train and equip Decedent to avoid exposure to hazardous substances encountered in connection with relief efforts;

    c.    a duty to conform to the provisions of the National Contingency Plan relating to the use of aerial chemical dispersants in the proximity of vessels and shallow waters;

    d.    a duty to coordinate and conduct aerial spraying sorties in a manner so as to eliminate the risk of vessels and crewmembers being exposed to aerial chemical dispersants; and

    e.    a duty to otherwise exercise reasonable care in the operation, maintenance, handling, design, implementation and execution of the relief and recovery measures to avoid harm to Decedent.

116.    Decedent suffered injury and loss as a result of Defendants' breach of their aforementioned duties. Specifically, Defendants breached their duties owed to the Plaintiffs by:

    a.    failing to warn the Decedent of the harmful effects of crude oil, chemical dispersants and any mixture thereof, and the hazardous substances which they contain, which have come into contact with Plaintiffs' persons and the local environment and ecosystems;

    b.    failing to properly train and equip Decedent to avoid exposure to hazardous substances encountered in connection with relief efforts;

c.      failing to abide by the provisions of the National Contingency Plan relating to the use of aerial chemical dispersants in the proximity of vessels and in shallow waters;

d.      failing to coordinate and conduct aerial spraying sorties in a manner so as to eliminate the risk of vessels and crewmembers being exposed to aerial chemical dispersants; and

e.      failing to otherwise exercise reasonable care in the operation, maintenance, handling, design, implementation and execution of the relief and recovery measures to avoid harm to Decedent.

117.   All of Decedent's and Plaintiffs' damages were caused in fact by Defendants' breach of their duties.

118.   Defendants' breach of their duties posed an unreasonable risk of harm to Decedent.

119.   Defendants are liable in ordinary negligence to Decedent and Plaintiffs.

120.   The danger and risk of harm to Decedent was reasonably foreseeable.

121.   Defendants' breach of their duties was the direct and proximate cause of Decedent's death and all of Decedent's and Plaintiffs' damages, and Defendants are liable therefore.

**Gross Negligence (Against All Defendants)**

122.   Defendants owed and breached duties of ordinary and reasonable care to Decedent in connection with the manufacture, maintenance and operation of the *Deepwater Horizon* and with the clean-up following the Oil Spill, and additionally owed and breached duties to Decedent to guard against and/or prevent the risk of the Oil Spill which occurred herein. The existence and breach of these legal duties are established under the General Maritime Law and state law as deemed applicable herein.

123.    Defendants have taken control and responsibility for all aspects of the recovery and relief effort to attempt to contain the Oil Spill, prevent oil from damaging the Gulf of Mexico and the shoreline, and to clean up the damage caused to date, including the use of Nalco's chemical dispersants. Defendants owed and breached a duty to Decedent, as well as to all persons who might foreseeably be harmed, to exercise due care in the operation, maintenance, handling, design, implementation and execution of the relief and recovery measures. The existence and breach of these legal duties are established under the General Maritime Law and state law as deemed applicable herein.

124.    Defendants had a heightened duty of care to Decedent because of the great danger associated with exposure to oil, dispersants, and/or other hazardous chemicals.

125.    Defendants breached their legal duty to Decedent and failed to exercise reasonable care and acted with reckless, willful, and wanton disregard in the negligent failure to contain the Oil Spill.

126.    Defendants knew or should have known that their wanton or reckless conduct would foreseeably cause Decedent's and Plaintiffs' injury and/or damages.

127.    As a direct and proximate cause of Defendants' wanton or reckless acts, Decedent and Plaintiffs have suffered physical injuries and/or damages.

128.    Defendants' wanton or reckless conduct, as described herein, entitles Plaintiffs to punitive damages. The amount of punitive damages recoverable by Plaintiffs is not lawfully limited to the amount of their compensatory damages, but rather should be a multiplier of same sufficient to both punish Defendants and deter similar wrongdoing in the future.

**Negligence *Per Se* (Against All Defendants)**

129.   Defendants' conduct with regard to the manufacture, maintenance and/or operation of drilling operations and oil vessels such as the *Deepwater Horizon*, the release of hazardous and toxic chemicals into the environment, and the application of dispersants and other hazardous chemicals is governed by numerous state and federal laws and permits issued under the authority of these laws. These laws and permits create statutory and regulatory standards that are intended to protect and benefit Decedent, including, but not limited to, those set forth in Section 311 of the Clean Water Act, 40 C.F.R. § 300 App. E, 30 C.F.R. Part 254 and the OPA, 33 U.S.C. § 2717(b).

130.   One or more of Defendants violated these statutory and/or regulatory standards.

131.   Defendants' violations of these statutory and/or regulatory standards constitute negligence *per se* under Louisiana law.

132.   Defendants had actual and/or constructive knowledge of the facts and circumstances leading to and causing the incidents described herein which in turn caused Decedent's death and Plaintiffs' injuries and their actions and inactions were grossly negligent, reckless, willful and/or wanton.

133.   As a direct and proximate cause of Defendants' violation of statutory and/or regulatory standards, Decedent and Plaintiffs have suffered physical injuries and/or damages.

134.   In addition to the negligent actions described above, and in the alternative thereto, the injuries and damages suffered by Decedent were caused by the acts and/or omissions of the Defendants that are beyond proof by Plaintiffs, but which were within the knowledge and control of the Defendants, there being no other possible conclusion than that the fire, explosion, sinking, Oil Spill, and clean-up following the Oil Spill resulted from the negligence of Defendants. Furthermore, the fire, explosion, sinking, Oil Spill, and clean-up following the Oil Spill would

not have occurred had the Defendants exercised the high degree of care imposed on them and Plaintiffs, therefore, plead the doctrine of *res ipsa loquitur.*

**Negligence (Against Nalco)**

135.   Plaintiffs are entitled to recover from Nalco for its negligence with respect to the design, manufacture, marketing, sale and/or distribution of Corexit®.

136.   At all times relevant hereto, Nalco was in the business of designing, manufacturing, marketing, selling and/or distributing the dispersants used in response to oil spills.

137.   Nalco sold and delivered the Corexit® to BP and the Dispersant Defendants immediately after the Oil Spill and placed the Corexit® in the stream of commerce.

138.   Nalco knew that the Corexit® would be used without inspection for defects.

139.   Nalco's chemical dispersants were unreasonably dangerous to Decedent for their intended purpose when the dispersants left Nalco's control.

140.   At all times, Nalco's dispersants were used in the manner intended, or in a manner reasonable foreseeable and/or actually disclosed to BP prior to sale of the dispersants.

141.   When the Corexit® was used, it was in substantially the same condition when it was sold.

142.   At the time the dispersants left Nalco's control, Nalco knew, or in light of reasonably available knowledge or in the exercise of reasonable care should have known, about the aforementioned unreasonably dangerous conditions that dispersants would present to Decedent who was not properly equipped with protective gear.

143.   At the time the dispersants used in response to the *Deepwater Horizon* disaster left Nalco's control, feasible design alternatives existed which would have, to a reasonable probability, prevented the harm suffered by Decedent without impairing the utility, usefulness, practicality or desirability of the dispersant.

144.   At all relevant times, the dispersant was used in an intended and/or reasonably foreseeable manner.

145.   Decedent was a foreseeable bystander and victim of the manifestation of the defects in the dispersants.

146.   The design defect in the Corexit® is its toxicity to humans and its ability to cause physical injury, health hazards, and damage to property because of its toxicity.

147.   Nalco had actual and/or constructive knowledge of the facts and circumstances relative to the dispersants that caused or contributed to Decedent's injuries, and its actions and inactions were negligent, grossly negligent, reckless, willful and/or wanton.

148.   As a direct and proximate result of the design defect, Decedent and Plaintiffs have suffered physical injury damages, damages, loss of income, loss of consortium and/or emotional distress, for which they are entitled to actual, compensatory and punitive damages.

149.   In the alternative, Plaintiffs seek relief pursuant to the Louisiana Products Liability Act (La. Rev. St. Ann. § 9:2800.51, *et seq.*).

**Strict Liability Under General Maritime Law (Against Nalco)**

150.   Plaintiffs are entitled to recover from Nalco for its defective design of Corexit®.

151.   At all times relevant hereto, Nalco was in the business of designing, manufacturing, marketing, selling and/or distributing the dispersants used in response to oil spills.

152.   Nalco sold and delivered the Corexit® to BP and the Dispersant Defendants immediately after the Oil Spill and placed the chemical dispersants in the stream of commerce.

153.   Nalco knew that the Corexit® would be used without inspection for defects by consumers.

154.   Nalco's dispersants were unreasonably dangerous to Decedent for its intended purpose when it left Nalco's control.

155.   When BP and Dispersant Defendants used Corexit®, it was in substantially the same condition when it was sold.

156.   At all times, Nalco's dispersants were used in a manner consistent with the uses intended by or known to Defendants and in accordance with Defendants' directions and instructions.

157.   At all relevant times, the dispersant was used in an intended, or in a manner reasonable foreseeable and/or actually disclosed to BP prior to sale of the dispersants.

158.   At the time the dispersants left Nalco's control, Nalco knew, or in light of reasonably available knowledge or in the exercise of reasonable care should have known, about the aforementioned unreasonably dangerous conditions that dispersants would present to Decedent who was not properly equipped with protective gear.

159.   At the time the dispersants used in response to the *Deepwater Horizon* disaster left Nalco's control, feasible design alternatives existed which would have, to a reasonable probability, prevented the harm suffered by Decedent without impairing the utility, usefulness, practicality or desirability of the dispersant.

160.   At all relevant times, the dispersant was used in an intended and/or reasonably foreseeable manner.

161.   Decedent was a foreseeable bystander and victim of the manifestation of the defects in the dispersants.

162.   The design defect in the Corexit® is its toxicity to humans and its ability to cause physical injury, health hazards, and damage to property because of its toxicity. The Corexit® was also defectively inspected, tested, marketed and sold.

163.    Defendant Nalco's product was not misused or altered by any third parties, Decedent, or Plaintiffs.

164.    Nalco had actual and/or constructive knowledge of the facts and circumstances relative to the dispersants that caused or contributed Decedent's injuries, and its actions and inactions were grossly negligent, reckless, willful and/or wanton.

165.    As a direct and proximate result of the design defect, Decedent and Plaintiffs have suffered physical injury damages, damages, loss of income, loss of consortium and/or emotional distress, for which they are entitled to actual, compensatory and punitive damages.

166.    In the alternative, Plaintiffs seek relief pursuant to the Louisiana Products Liability Act (La. Rev. St. Ann. § 9:2800.51, *et seq.*).

**Punitive Damages**

167.    Defendants focused primarily on profit while disregarding public and environmental health and safety while undertaking their ultra-hazardous activities on the *Deepwater Horizon* and the clean-up following the Oil Spill.

168.    Defendants BP, Transocean, and Halliburton engaged in conduct so reckless, willful, wanton and in such utter and flagrant disregard for the safety and health of the public and the environment in their activities leading up to and/or during the blowout, explosions, fire, and Spill, as alleged herein, that an award of punitive damages against them at the highest possible level is warranted and necessary to impose effective and optimal punishment and deterrence. Plaintiffs, society and the environment cannot afford and should never be exposed to the risks of another disaster of the magnitude caused by Defendants' misconduct herein.

169.    BP, Transocean, and Halliburton focused primarily on profit while disregarding public and environmental health and safety while undertaking their ultra-hazardous activities on the

*Deepwater Horizon* by performing a critical well pressure test with untrained and unqualified personnel and by callously ignoring and/or misinterpreting abnormal "red flag" pressure test results.

170.    BP's corporate culture caused and allowed it to disregard the lessons it should have learned and applied from previous incidents at its facilities that resulted in extensive damage and loss of live; instead, it continued to place others at risk in the interests of cost-cutting and financial gain.

171.    Transocean callously and with reckless disregard for human life disabled the flammable gas alarm system aboard the *Deepwater Horizon* and prevented said system from operating properly and preventing or containing the explosions, fire and loss of life.

172.    BP, Transocean, and Halliburton focused primarily on profit while disregarding public and environmental health and safety while undertaking their ultra-hazardous activities on the *Deepwater Horizon* by using a well design with too few barriers to gas flow.

173.    BP, Transocean, and Halliburton focused primarily on profit while disregarding public and environmental health and safety while undertaking their ultra-hazardous activities on the *Deepwater Horizon* by failing to use a sufficient number of "centralizers" to prevent channeling during the cement process.

174.    BP, Transocean, and Halliburton focused primarily on profit while disregarding public and environmental health and safety while undertaking their ultra-hazardous activities on the *Deepwater Horizon* by failing to run a bottoms up circulation of the drilling mud prior to beginning the cement job.

175.    BP, Transocean, and Halliburton focused primarily on profit while disregarding public and environmental health and safety while undertaking their highly dangerous activities on the

*Deepwater Horizon* by using an inappropriate cement mixture for the type of rock formation surrounding the well, and by failing to appropriately test that cement mixture prior to using it in the well.

176.    BP, Transocean, and Halliburton focused primarily on profit while disregarding public and environmental health and safety while undertaking their highly dangerous activities on the *Deepwater Horizon* by failing to run a cement bond log to evaluate the integrity of the cement job.

177.    BP, Transocean, and Halliburton focused primarily on profit while disregarding public and environmental health and safety while undertaking their highly dangerous activities on the *Deepwater Horizon* by failing to deploy the casing hanger lockdown sleeve prior to commencing the mud displacement process in the well.

178.    BP, Transocean, and Halliburton focused primarily on profit while disregarding public and environmental health and safety while undertaking their highly dangerous activities on the *Deepwater Horizon* by using an untested, abnormally large volume of mixed spacer solutions to avoid having to properly dispose of the two separate spacer substances as hazardous wastes.

179.    BP, Transocean, and Halliburton focused primarily on profit while disregarding public and environmental health and safety while undertaking their highly dangerous activities on the *Deepwater Horizon* by ignoring and/or misinterpreting abnormal, "red flag" pressure test results.

180.    BP, Transocean, and Halliburton recklessly, willfully and/or wantonly caused or contributed to the catastrophic Spill by their grossly inadequate maintenance, and reckless and improper operation and use of the blow-out preventers appurtenant to the *Deepwater Horizon*.

181.   BP, Transocean, and Halliburton recklessly, willfully and/or wantonly failed to ensure that oil would expeditiously and adequately be contained within the immediate vicinity of the *Deepwater Horizon* in the event of a blowout.

182.   BP, Transocean, and Halliburton recklessly, willfully and/or wantonly caused or contributed to the catastrophic Spill through their collective and respective disregard for proper drilling, casing, mudding, and cementing procedures.

183.   BP, Transocean, and Halliburton willfully and/or wantonly failed to ensure that that adequate safeguards, protocols, procedures and resources would be readily available to prevent and/or mitigate the effects an uncontrolled oil spill into the waters of the Gulf of Mexico.

184.   BP recklessly, willfully and/or wantonly failed to utilize reasonably safe dispersant chemicals in its haphazard attempts to respond to the Spill, and thereby exacerbated and worsened the pollution of the Gulf of Mexico.

185.   In addition, after the blowout and before the well was finally sealed, BP was aware of procedures that would immediately block the flow of oil into the Gulf, yet it delayed the implementation of any such procedures, and limited its efforts to plug the well to options that would salvage the well for future use, instead of selecting procedures that would stop the flow of oil as soon as possible regardless of the well's continued functionality. As such, BP increased the magnitude of, and damage caused by, the Spill by willfully and/or wantonly and recklessly choosing its profits over the lives of the workers on the vessel, the safety of the environment, and the health, welfare, and value of the people, businesses, and property of the Gulf states.

186.   Defendants' conduct was oppressive, wanton, malicious, reckless, or grossly negligent each time they:

      a.        failed to properly maintain and/or operate the *Deepwater Horizon*;

      b.        operated the *Deepwater Horizon* in such a manner the safety and integrity of the vessel and the well were disregarded to save time and money;

      c.        ignored warnings that the integrity of the well, the cementing job, and the vessel were in jeopardy;

      d.        failed to promulgate, implement, and enforce proper rules and regulations to ensure the safe operations of the *Deepwater Horizon*;

      e.        violated MMS regulations for the safe design and operation of oil wells and drilling rigs in the Gulf of Mexico;

      f.        failed to take appropriate action to avoid or mitigate the accident;

      g.        failed to implement policies and procedures to safely conduct offshore operations in the Gulf of Mexico;

      h.        failed to ensure that the *Deepwater Horizon* and its equipment were free from defects, properly maintained and/or in proper working order;

      i.        failed to provide appropriate disaster prevention equipment;

      j.        failed to have an appropriate emergency spill response plan or readily available spill response equipment.

187.    BP and Dispersant Defendants recklessly, willfully and/or wantonly caused or contributed to Decedent's and Plaintiffs' injuries by their tortious design, and reckless and wanton operation and use of chemical dispersants.

188.    BP and Dispersant Defendants recklessly, willfully and/or wantonly failed to ensure that Decedent would be adequately protected from exposure to harmful chemicals in oil, chemical dispersants, and other harmful chemicals resulting from the Oil Spill.

189.    Defendants willfully and/or wantonly failed to ensure that that adequate safeguards, protocols, procedures and resources would be readily available to prevent and/or mitigate the effects of an uncontrolled oil spill into the waters of the Gulf of Mexico and the corresponding clean up response measures involving the use of chemical dispersants.

190.    BP and Nalco recklessly, willfully and/or wantonly failed to utilize reasonably safe dispersant chemicals in its haphazard attempts to respond to the Oil Spill, and thereby exacerbated and worsened the pollution of the Gulf of Mexico.

191.    Defendants' conduct, as described more fully hereinabove, is at the highest level of reprehensibility, warranting and necessitating the imposition of punitive damages at the highest level, because Defendants' conduct was motivated by financial gain; because it injured and endangered human and environmental health and safety; because it caused devastating damage to Decedent and Plaintiffs; because it was not isolated or accidental, but part of a culture and ongoing pattern of conduct that consistently and repeatedly ignored risks to others in favor of financial advantage to Defendants; and because it has accordingly caused societal harm, moral outrage and condemnation, and the need to punish Defendants and deter further repetition by Defendants or others.

192.    Accordingly, Plaintiffs are entitled to an award of punitive damages in an amount to be determined at trial.

193.    Plaintiffs request a trial by jury.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs, William J. Fitzgerald, III, Dianna M. Fitzgerald, individually and on behalf of decedent Nathan Joseph Fitzgerald, pray that after due proceedings had, there be judgment rendered in favor of Plaintiffs and against Defendants jointly, severally and in solido for compensatory, punitive, exemplary and other appropriate damages which are reasonable in the premises, together with interest from the date of judicial demand, together with all costs of these proceedings and all other general and equitable relief which is appropriate.

RESPECTFULLY SUBMITTED:

PIVACH, PIVACH, HUFFT,
THRIFFILEY & DUNBAR, L.L.C.
Attorneys at Law

    /s/ Corey E. Dunbar
GEORGE PIVACH, II (10798)
COREY E. DUNBAR (30144)
ATTORNEY AT LAW
8311 Highway 23, Suite 104
P.O. Box 7125
Belle Chasse, Louisiana 70037
Telephone: (504) 394-1870
Email: firm@pivachlaw.com